IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ASHLEY DIXON,<br><br>    Plaintiff,<br><br>v.<br><br>CITY OF ATLANTA,<br>OFFICER MATTHEW GORDON,<br>in his individual capacity,<br>and<br>OFFICER JEFF CANTIN,<br>in his individual capacity<br><br>    Defendants. | CIVIL CASE NO.:<br>1:24-cv-02061-JPB |

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF ATLANTA'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

COMES NOW Ashley Dixon, a Plaintiff in the above styled action, files the above Brief in Support of her Response to Defendant City of Atlanta's Motion to Dismiss Plaintiff's Complaint and shows this Court as follows:

### INTRODUCTION

On August 5, 2024 the City of Atlanta (The City) filed its Motion to Dismiss Plaintiff's Complaint as to the City. The City's arguments are fairly simple. As to

the "final policy maker" of the Monell claim the City argues that the only final policy maker within the Atlanta Police Department is the Police Chief and therefore if no actions of the police chief are explicitly alleged in the Complaint the final policy maker claim by the plaintiffs should fail. This very argument was recently rejected by this Court in Gadomski v. City of Atlanta et al. (Case No. 1:23-cv-04036-TWT; N.D. Ga. June 20, 2024).

As to the failure to train claim the City makes a cursory and conclusory argument that "a closer inspection of the cases fails to demonstrate deliberate indifference to known constitutional violations" because the bar for those claims to survive is "high" (City Brief p. 9). The City fails to elaborate any further on that argument other than to say that in some of the cases cited by Plaintiff no failure to train was specifically found at the motion to dismiss stage. (City Brief p. 10) This is a curious argument given the fact that a specific finding of failure to train (or any other fact for that matter) is not a proper subject of a motion to dismiss ruling to begin with. Rather – it is law school level knowledge that a motion to dismiss ruling tests the sufficiency of the complaint allegations which is something completely different from the Court making actual findings of fact of its own.

## STANDARD OF REVIEW

Mere conclusory allegations or bare legal conclusions are generally not sufficient to withstand a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim. See Briehl v. General Motors Corp., 172 F.3d 623, 627-23 (8th Cir. 1999). In general, a motion to dismiss under 12(b)(6) asserts that even if the well pleaded material allegations of the complaint are true, such allegations are legally insufficient. Such a motion should be granted when it appears to a certainty that the plaintiff is entitled to no relief under any state of facts which can be proven in support of the claim. See Haines v. Kerner, 92 S. Ct. 594 (1972).

Where a defendant challenges a complaint for failing to adequately state a claim upon which relief can be granted, the court should apply a "two-pronged approach" in analyzing the complaint. See Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (l1th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)). First, the court should "eliminate any allegations in the complaint that are merely legal conclusions." Id. This first prong excludes "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." Iqbal, 556 U.S. at 663. Second, the court should assume that all well-pleaded factual allegations are true "and then determine whether [those allegations] plausibly give rise to an entitlement to relief." Am. Dental Ass'n., 605 F.3d at 1290. In determining

plausibility, the court should "draw on its experience and common sense." Iqbal, 556 U.S. at 664. Moreover, it is proper for the court to infer "'obvious alternative explanations' which suggest lawful conduct rather than the unlawful conduct the plaintiff[s] would ask the court to infer." Am. Dental Ass'n, 605 F.3d at 1290 (quoting Iqbal and relying on Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)).

On the other hand – however – a complaint may survive a motion to dismiss for failure to state a claim even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote or unlikely." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).

Ultimately, if the plaintiff has not "nudged [her] claims across the line from conceivable to plausible, their complaint must be dismissed." Id. at 1289 (quoting Twombly, 550 U.S. at 570).

## MONELL LIABILITY

### a. Policy, Practice and Failure to Train

Municipal liability under § 1983 may not be grounded on a theory of respondeat superior. Monell v. New York Dept. of Social Services, 436 U.S. 658 (1978). That said, it is "well established that a municipality may be held liable under § 1983 . . . when the deprivation at issue was undertaken pursuant to [municipal] 'custom' or 'policy.'" Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1479 (11th Cir. 1991).

Municipal liability may be based on, among other things, "a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." Church v. City of Huntsville, 30F. 3d 7332,1343 (11th Cir. 1994). Congruently, a plaintiff may establish a policy or custom exists by showing a "persistent and wide-spread practice" and the government's actual or constructive knowledge of that practice coupled with deliberate indifference toward same. Id. at 1342-43.

In determining plausibility, the court should "draw on its experience and common sense." Iqbal, 556 U.S. at 664. Common sense comes in particularly sharp focus when pedestrian in the roadway statute is at issue. At least a couple of incidents of pedestrian in the roadway arrests cited in the Complaint occurred in a relatively close proximity of this Courthouse. The undersigned counsel, the opposing counsel, and possibly members of this Court have all likely jaywalked on the same streets at some point – undoubtedly without any fear of arrest. Yet – time and again – when individuals are being engaged in a protest – they are routinely arrested under pedestrian in the roadway statute – and this is done to a degree that spans from individual arrests made by officers on the ground to mass arrests being ordered by high ranking officers. This is precisely the type of unconstitutional first amendment retaliation referred to in Nieves v. Bartlett, 139 S. Ct. 1715 (2019), and it is done on

a routine basis. Plaintiff here has alleged sufficient number of incidents to establish the plausibility and is entitled to conduct discovery to prove their case.

A recent United States Supreme Court decision Gonzalez v. Trevino, 602 U.S. ____ (2024) decided on June 20th, 2024 deals with the above mentioned Nieves exception and specifically with the type of evidence Plaintiff can use to prove first amendment retaliation. The United States Supreme Court in Gonzalez held that the only limit is that the evidence be objective.

> "We recognized the Nieves exception to account for "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 587 U. S., at 406. To fall within the exception, a plaintiff must produce evidence to prove that his arrest occurred in such circumstances. The only express limit we placed on the sort of evidence a plaintiff may present for that purpose is that it must be objective in order to avoid "the significant problems that would arise from reviewing police conduct under a purely subjective standard."

Gonzalez, Slip Opinion p. 4.

As for the "pedestrian in the roadway" crime Chief Justice Roberts had this to say during the oral argument in Gonzalez case: "Well, I mean, in Nieves, the whole point is -- we were talking about jaywalking, and the point is nobody's ever arrested for jaywalking unless there's something fishy going on."

The takeaway for the present case being as follows: after Nieves and Gonzalez there should be no doubt that using pedestrian in the roadway charges to crack down on protests and limit speech is constitutionally impermissible – or as we like to call

it - clearly established law. The one crime that received the honor of the special mention in the Nieves opinion was the "jaywalking" crime. That same crime has again been addressed during the Gonzalez oral argument as the most common sense example of a charge used as a pretext for first amendment retaliation. It is unfortunate that after all this - pages of briefs still have to be devoted to driving home this very basic common sense proposition. And it is equally plain that if a complaint alleges that officers are not trained to not arrest individuals for pedestrian in the roadway in retaliation for their speech (that is to say – they are not trained on the Nieves exception) and yet are routinely arresting protesters on pedestrian in the roadway charges – the complaint is plausibly alleging deliberate indifference. In fact – the present complaint goes beyond just alleging deliberate indifference – it alleges intentional actions and policy on the part of the City considering the involvement of high ranking officers and even City Council discussions. (See allegations in Par. 43 of Plaintiff's complaint regarding City Council discussions.)

While Defendant City in its motion does not make anything beyond a cursory "plaintiff doesn't pass the high bar" argument - other arguments typically made in cases such as this (and which may end up being advanced by the City in its reply brief) do not have merit either and are briefly discussed below.

For example – there is no prescribed number of incidents that need to be alleged. This is left to the judgment of this Court considering all the circumstances. While the City argues and the law states that "One or two incidents of abuse is generally insufficient to create a pattern." <u>Williams v. Fulton County School District</u>, 181 F. Supp. 3d 1089, 1122 (N.D. Ga. 2016), this case alleges more than one or two incidents.

City further may argue that past complaints have to have merit. While this is true – the way "merit" is determined is not by scouring through the court dockets to see if a successful claim has been brought as a result of each violation. It matters not whether the case of violation ever reached courts. The case cited by defendants involves an example where the instances clearly did not have merit – based on even cursory observation – and it does not by any means stand for the proposition that a case had to be adjudicated favorably before the case is to be deemed to have merit. According to <u>Brooks v. Scheib</u>, 813 F.2d 1191, 1193 (11th Cir. 1987), "Brooks never demonstrated that past complaints of police misconduct had any merit. Indeed, the number of complaints bears no relation to their validity. In Scheib's case, for example, there is a logical explanation as to why a large number of complaints have been lodged against him…"

Specifically as it comes to mass arrests in the present case – these arrests share some of the same characteristics as the Baker case. Having a lawsuit filed against the City is about the clearest type of notice the City could get. And having had that notice and then repeating the same conduct (even after the arrests in the Gadomski cases) indicates that the City keeps sticking to the same policy – even after the notice.

The City may attempt to disqualify the instances of violations incorporated from allegations in Watchulonis case (Complaint Par. 42). Essentially the City may argue that the violations are to be defined at a lower level of generality. Under that logic only violations involving retaliatory pretextual arrests for pedestrian in the roadway would count towards the "policy and practice" while other first amendment violations (such as arrests of journalists) would not.

Plaintiff – however - argues that the problem of City suppressing First Amendment rights of its citizens (whether protesters by using pedestrian in the roadway pretextual arrests or journalists by using other methods) is a discreet type of violation that does not need to be broken down to a lower level of generality lest we run a risk that each instance becomes a case of its own and even pedestrian in the roadway cases need to be broken down further depending on some distinguishing factors.

Incidents incorporated from Watchulonis case demonstrate that the City has long disregarded First Amendment rights of its citizens and has in fact resisted the training requirements when it comes to journalists to the point of being found in contempt of this Court in 2015.

Finally – while not all of the arrests on May 14, 2022 involved journalists and / or filming the Ryan Seal case definitely did. This underscores how intertwined different methods of first amendment suppression really are. Gadomski cases and the present cases all involve journalists arrested alongside protesters because both (Omelchenko in Gadomski cases and Seal in the present set of cases) dared to film a Stop Cop City protest. The City doesn't shy away from arresting journalists and protesters alike on the same charges – but the courts have no problem slicing and dicing the City's conduct into different boxes and into different levels of generality *ad infinitum* until there is nothing left to see – proverbially speaking. In any event the incidents incorporated from Watchulonis case (Complaint Par. 42) should at a minimum count towards the complaint of Ryan Seal because Seal alleges that he "was there in his capacity as an independent film maker to document the events." (Ryan Seal Complaint Par. 12).

Because plaintiff alleges a sufficient number of incidents and because the City did nothing to train its officers on the Nieves first amendment retaliation law the plaintiff properly alleged a failure to train.

While several of the instances cited involve orders to conduct mass arrests by high ranking APD officers this factual allegation does not change the analysis in such a way as to suggest the absence of need to train lower ranking officers. (See for example Gadomski v. City of Atlanta et al. (Case No. 1:23-cv-04036-TWT; N.D. Ga. June 20, 2024) suggesting that "here, the Plaintiffs' arrests were caused by Lieutenant Floyd's alleged unilateral arrest order, rather than any lack of training on any of the officers' parts." Id. at 7 (citation omitted)). Just because a high ranking officer issued an illegal order does not mean that lower ranking officers do not need to be trained on the order's illegality and the necessity not to follow that order. If anything – that suggests an even greater need to train.

### b. Final Policy Maker

"[A] municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review." Scala v. City of Winter Park, 116 F.3d 1396, 1401 (11th Cir. 1997). The Complaint, however, alleges that defendant Gordon's order was not subject to any administrative review.

This Circuit has emphasized an important limit on final policymakers: when policymaking authority is delegated to a subordinate (for example the Elections Supervisor), the Board of Elections must not retain power to exercise meaningful and timely review for the individual delegated powers to be the final policymaker:

[T]he mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. *Rather, the delegation must be such that the subordinate's discretionary decisions* are not constrained by official policies and *are not subject to review.*

Mandel v. Doe, 888 F.2d 783, 792 (11th Cir. 1989) (emphasis added) (citations omitted); see also City of St. Louis v. Prapotnick, 485 U.S. 112, 129-130 (1988). Absent an explicit review process, delegated policymakers may create and execute municipal policy. Mandel, 888 F.2d at 792-94 (municipal officer has final policymaking authority when his decisions "are not subject to review" and further holding that discretionary review initiated by the municipal official himself does not prevent the official from being a final policymaker). This Circuit has also emphasized that that review must be explicit, and a citizen must have a realistic/meaningful opportunity to exercise a timely and effective appeal.

In Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1278 (11th Cir. 2004), this Circuit reviewed the punishment by a Principal of a student for raising a fist

during the flag salute. Even though there was an explicit appeal process of the asserted final policymaker/Principal's decisions, this Circuit found that the requirement of "meaningful review" was not satisfied because review was not effective as there was no opportunity to exercise the process to timely correct a free speech violation or the resulting punishment:

> [W]e look to whether there is an actual "opportunity" for "meaningful" review…..
>
> In the instant case, there was no opportunity for meaningful review by the School Board. While the student handbook set out an formal multi-step appellate process that was theoretically available on paper, Holloman could not, as a practical matter, take advantage of it. Graduation was barely a few days away, and Harland did not offer to "stay" Holloman's punishment while he sought Board review. Indeed, the record is silent as to whether there would even be an intervening meeting of the Board or other opportunity to invoke its oversight. Even if the School Board were to engage in an *ex post* review of the punishment, the fact remains that the paddling could not be undone. Due to the impending end of the school year, the punishment—unlike the suspension in *Denno*—could not be postponed to potentially allow for Board review; Harland had made it clear that if Holloman did not submit to punishment, he would not receive his diploma on graduation day.

370 F.3d at 1292–93 (citations omitted) (collecting Eleventh Circuit authority on "meaningful" review of a delegated policymaker's decisions). Indeed, Hollman emphasized that, "where a punishment is [] a *fait accompli* or [not] otherwise irreversible":

> In granting him this power without integrating itself into the pre-spanking review process, the Board necessarily bound itself to his decisions. Thus, the School Board's delegation of effectively unreviewable corporal punishment

-13-

> authority constitutes a related yet alternate basis upon which we find that Harland was a final decision maker. Consequently, depending on how the facts ultimately develop at trial, the Board may be held liable under the First Amendment for either his decision to punish Holloman for engaging in constitutionally protected expression, or to punish Holloman for engaging in unprotected expression on impermissible viewpoint-based grounds. Id. at 1293-1294.

*Id*. at 1293-94. See also Willingham v. City of Valparaiso, Florida, 638 Fed. Appx. 903, 907-908 (11th Cir. 2016) (delegated final policymaker: "a finding that review procedures are 'theoretically available on paper' does not end the inquiry when [the plaintiff] . . . as a practical matter, [cannot] take advantage of it.'").

Scala v. City of Winter Park, 116 F.3d 1396, 1401 (11th Cir. 1997) ("This Court's post-*Praprotnik* decisions have consistently recognized and given effect to the principle that a municipal official does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review."); Hill v. Clifton, 74 F.3d 1150, 1152 (11th Cir. 1996) (city police chief not final policymaker with respect to employment decisions where police chief's decisions could be reversed by the city manager); Martinez v. City of Opa-Loka, 971 F.2d 708 (11th Cir. 1992) (final policymaking authority where "the City Manager's decision to hire or fire administrative personnel is completely insulated from review").

Here, however, Defendant Gordon was completely insulated from any review.

Finally – and most importantly – the present case is virtually indistinguishable from Gadomski v. City of Atlanta et al. (Case No. 1:23-cv-04036-TWT; N.D. Ga. June 20, 2024) – a case where this Court denied City's motion to dismiss based on almost identical factual allegations. Indeed Gadomski case is one of the "incidents" cited in the complaint at issue in this case and *vice versa* – the facts of the present case are cited in Gadomski as one of the "incidents" supporting the Gadomski consolidated complaints.

If anything the present case is stronger than Gadomski because the Gadomski "incident" predates the present one.

This is what the Court in Gadomski had to say about the final policy maker claim:

Although the Plaintiffs here have alleged that Lieutenant Floyd was a final policymaker, (Am. Compl. ¶ 48), the Court concludes that such an allegation does not foreclose the Plaintiffs' Monell claim, **even if the chief of police in fact held all final policymaking authority**.

> Relevant here, a plaintiff may establish Monell liability "by showing that . . . someone with final policymaking authority adopts or ratifies the unconstitutional act or decision of a subordinate." Rogers v. City of Atlanta, 214 F. Supp. 3d 1314, 1317 (N.D. Ga. 2016) (emphasis added) (quotation marks and citation omitted). "So not all theories of municipal liability under § 1983 require (or depend on) a single final policymaker." Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016). Thus, even if Lieutenant Floyd did not have final policymaker authority, the Plaintiffs still plead a viable Monell claim because someone with final policymaking authority (the police chief) plausibly ratified his allegedly unconstitutional acts (and the acts of other police leaders who have allegedly ordered such pretextual arrests). (See Am. Compl. ¶ 40 (alleging "that there is an official policy or directive by final policy maker(s) within the City of Atlanta to engage in practice of arresting protesters under the pretext of violating pedestrian

in the roadway laws and the City – if not deliberately promoting this policy – is at the very least deliberately indifferent to it")).

Id. at 8-9 (emphasis added)

And regarding Plaintiff's allegation in Paragraph 43 that high ranking officers involved in the cited "incidents" are "routinely promoted subsequent to those violations" Plaintiff would like to conclude with an observation that Gary Harper, a defendant from the Baker case mentioned in Par. 38 of the present complaint was since promoted to a Deputy Police Chief. Any claims that the City or the Chief are not aware of what is going on or that the Chief is not ratifying those incidents after the fact have no merit.

## CONCLUSION

The pleading standard applicable to this Complaint is "plausibility" not "preponderance of the evidence." In other words – Plaintiff is not required to prove his or her entire case in the Complaint. When presenting a well pleaded complaint as the Plaintiff has done in this case Plaintiff is entitled to discovery so that she can *then* prove her allegations by preponderance of the evidence.

The City – not surprisingly – is afraid of the discovery here – because it will inevitably expose the details of how the City is using pedestrian in the roadway laws to retaliate against first amendment protected activity.

However – because Plaintiff has pled sufficient instances of constitutional violations and in fact alleged a pervasive custom and practice that permeates all ranks of the police department Plaintiff is entitled to discovery and the Court should deny City's Motion to Dismiss.

Respectfully submitted this 18th day of August, 2024.

/s/Drago Cepar, Jr.
Drago Cepar, Jr.
Georgia Bar No. 142362

1900 The Exchange
Suite 490
Atlanta, Georgia 30339
Phone: 770-940-3233
Fax: 770-874-2987
dcepar@gmail.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in Times New Roman 14-point typeface.

/s/ Drago Cepar, Jr.
Drago Cepar, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed this BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT CITY OF ATLANTA'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT with the Clerk of Court using the CM/ECF system which will automatically send email notifications of such filing to all attorneys of record.

This 18th day of August, 2024.

/s/Drago Cepar, Jr.
Drago Cepar, Jr.
Georgia Bar No. 142362

1900 The Exchange
Suite 490
Atlanta, Georgia 30339
Phone: 770-940-3233
Fax: 770-874-2987
dcepar@gmail.com

Attorney for Plaintiffs